LODGED
CLERK, U.S. DISTRICT COURT

8/16/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ____LM____ DEPUTY

AO 91 (Rev. 11/11)  Criminal Complaint

FILED
CLERK, U.S. DISTRICT COURT

8/16/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ____D.C.____ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| Martrell Patrick Shaw, and | ) |
| Rontrell Brainell Shaw, | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

Case No.   **5:21-mj-00527**

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____July 31, 2021_____ in the county of _____San Bernardino_____ in the _____Central_____ District of _____California_____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| Defendant Martrell Patrick Shaw: | |
| 18 U.S.C. § 1951(a) | Interference with Commerce by Robbery |
| 18 U.S.C. §§ 924(c)(1)(A)(iii), (j)(1) | Discharge a Firearm in Furtherance of a Crime of Violence Causing Death |
| 18 U.S.C. § 2(a) | Aiding and Abetting |
| | |
| Defendant Rontrell Brainell Shaw | |
| 18 U.S.C. §§ 1951(a) and 3 | Interference with Commerce by Robbery and Accessory After the Fact |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

/s/ Pursuant to Fed. R. Crim. P. 4.1
_____
*Complainant's signature*

Jarrett Keegan, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____August 16, 2021_____

_____
*Judge's signature*

City and state: _____Riverside, California_____        Honorable Shashi H. Kewalramani, U.S. Magistrate
_____
*Printed name and title*

*AUSA:* Peter Dahlquist

**<u>AFFIDAVIT</u>**

I, Jarrett Keegan, being duly sworn, declare and state as follows:

**<u>PURPOSE OF AFFIDAVIT</u>**

1.   This affidavit is made in support of a criminal complaint and an arrest warrant against Martrell SHAW ("Martrell") for violations of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery); 924(c)(1)(A)(iii), (j)(1) (Use, Carry, Brandish, and Discharge a Firearm in Furtherance of a Crime of Violence Causing Death); and 2(a) (Aiding and Abetting).

2.   This affidavit is also made in support of a criminal complaint and arrest warrant against and Rontrell Shaw ("Rontrell") for a violation of 18 U.S.C. §§  1951(a) (Interference with Commerce by Robbery) and 3 (Accessory After the Fact).

3.   The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## BACKGROUND OF AGENT

4.   I am a Special Agent ("SA") with the United States
Department of Justice, Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF") in San Bernardino, California.  I joined ATF
in July 2014.  Prior to becoming a SA with the ATF, I was a
Federal Air Marshal with the Federal Air Marshal Service for
seven years.  During my career in federal law enforcement, I
have received extensive training regarding federal criminal law.
My education includes a Bachelor's Degree in Aerospace Studies
from Embry Riddle Aeronautical University and a Master's Degree
in Security Management from American Military University.

5.   As an SA, I have completed training at the ATF
National Academy and the Federal Law Enforcement Training Center
related to federal firearms and narcotics laws and
regulations.  I regularly refer to these laws and regulations
during the course of my duties and have written and participated
in the execution of numerous search and arrest warrants for
violations of these statutes.  During my career in the field, I
have participated in the investigation, surveillance, and arrest
of numerous prohibited persons in possession of firearms, as
well as firearms and narcotics traffickers, and subjects engaged
in crimes of violence such as robbery, carjacking, attempted
murder, and murder.

## SUMMARY OF PROBABLE CAUSE

6.   In the early evening hours of July 31, 2021, a
homicide occurred in San Bernardino, California.  Responding San
Bernardino Police Department ("SBPD") officers found the victim,

an adult male, lying on the ground just in front of his vehicle bleeding from multiple gunshot wounds.  The victim was pronounced deceased just under two hours later.

7.   The victim's vehicle was found to be running with fired cartridge cases (FCCs)[1] discovered inside and just outside the passenger door of the vehicle.  Officers spoke with a witness who observed two male suspects walking up to the victim's vehicle, with one of the suspects leaning in the front passenger's window and the other standing next to him.  The witness heard two gunshots then watched as the two suspects fled the victim's vehicle on foot.  High quality surveillance video was recovered which supported the witnesses' account.

8.   Homicide detectives with the SBPD Homicide Unit conducted further investigation, retrieving additional surveillance video which captured the two suspects fleeing the scene and being picked up by a gold Mercedes sedan.  Detectives noted one of the two suspects was carrying a large, dark colored duffel bag, and that the same suspect appeared to have dropped and picked up something just prior to entering the Mercedes.

---

[1] The basic components of a single round of ammunition include the case (aka the brass), the primer, the powder, and the projectile (aka the bullet).  When the firing sequence is initiated inside the firearm, the primer is struck igniting the gunpowder, which results in the buildup of immense pressure inside the case.  The pressure subsequently forces the projectile away from the case and down the firearm's barrel in rapid succession.  The completion of the firing sequence leaves the case intact with an embedded spent primer, identified in the law enforcement community as an FCC.

9.    Homicide detectives interviewed the victim's family, who stated the victim operated a mobile marijuana dispensary. The victim's family stated the victim always carried a 9mm Smith and Wesson pistol for protection, which was originally purchased by the victim's brother.  A search of the victim's vehicle yielded a large amount of suspected marijuana but no firearm, leading homicide detectives to believe the suspects' stole the victim's pistol and marijuana.

10.    Approximately a week after the homicide, investigators discovered the same gold Mercedes used as the getaway vehicle located parked in front of an apartment complex just one block from the scene of the shooting.  SBPD officers conducted surveillance of the Mercedes and observed two male subjects matching the physical characteristics of the suspects entering the apartment closest to the vehicle.  Investigators secured a state search warrant for the Mercedes and the associated apartment.

11.    On August 12, 2021, SBPD officers executed a search warrant at the apartment and detained brothers Martrell and Rontrell.  Rontrell identified himself as the owner of the gold Mercedes.  During the search of the small apartment, detectives found a loaded, unserialized pistol (or "ghost gun") and ammunition, as well as clothing and a duffel bag which matched what the suspects were wearing at the time of the homicide. Officers transported both Martrell and Rontrell to the SBPD station and interviewed them.

12.   During *Mirandized* interviews, both Martrell and Rontrell admitted to being involved in a robbery which resulted in the death of the victim.  Martrell, and Rontrell admitted playing a role in the robbery.  The suspects arranged to meet the victim in front of Cajon High School (where officers found the victim), just two blocks from Rontrell and Martrell's residence.  Rontrell dropped both Martrell and a third suspect off near the meeting location, with both Martrell and a third suspect walking up to the victim's vehicle with the intention of robbing him.  The third suspect pointed a handgun at the victim and demanded marijuana and other property.  The victim reached for his own handgun in the driver's side door pocket and the third suspect fired multiple shots at the victim.  Both Martrell and the third suspect fled the scene with the some of the victim's marijuana, firearm, and cash.  The two were picked up by Rontrell a block away, and the three split the marijuana proceeds from the robbery.

## STATEMENT OF PROBABLE CAUSE

13.   The following is based on my review of law enforcement reports and video evidence, as well as conversations with other law enforcement officers including SBPD Homicide Detective A. Reyna, the case agent on the investigation.  The following is a summary of the investigation:

**A.   Robbery of Marijuana Dealer on July 31, 2021**

14.   On July 31, 2021, at approximately 7:00 p.m., dispatchers with the San Bernardino Police Department received calls reporting shots fired in the area of 1200 W. Hill Dr.  The

reporting party ("RP") told dispatchers an unknown male subject (further identified as "the victim") approached the RP's residence and was visibly bleeding, just after the RP heard gunshots in the area.

15.   SBPD patrol officers responded to the scene and found the victim's vehicle, a black 2003 BMW 3-series displaying California license plate 5CWD542, parked facing west on the north curb line of W. Hill Dr., just west of N. Mountain Drive. The victim's vehicle was parked directly south of the loading zone area near the southeast corner of Cajon High School. Officers noted the victim's vehicle was running, with the driver side door ajar.  Officers found the victim near his vehicle, laying down on the grass on the north sidewalk of W. Hill Dr. The victim was found to have suffered apparent gunshot wounds to the neck and the left shoulder.  Medical personnel responded and transported the victim to San Bernardino Community Hospital where the victim succumbed to his injuries approximately 90 minutes after the shooting.

16.   Homicide detectives arrived on scene and searched the victim's BMW for evidence.  Detectives recovered a .40 caliber FCC from the front passenger seat of the BMW and a second .40 caliber FCC from the ground directly north of the passenger door near the sidewalk.  A bullet fragment was also collected from the floorboard directly behind the driver's seat.  Detectives further processed the vehicle and discovered the victim's iPhone inside the vehicle, which was functioning and receiving calls. Finally, inside the BMW, officers found Ziploc packaging, a

scale, and a duffle bag containing an additional scale with a large quantity of marijuana.  Detectives did not find a firearm inside the vehicle.

### B.  Witness Interviews

17.  Officers canvassed the area, interviewing multiple witnesses, including witness #1 (further identified as "witness #1").[2]  Witness #1 stated he/she was walking his/her dog outside when he/she observed two black male subjects, described as "teens" walk up to the victim's vehicle.  Witness #1 stated he/she watched as the two subjects conversed with the victim for several seconds.  Witness #1 stated as he/she began to walk inside, he/she heard what he/she described as "two pops" then looked to see the two subjects running westbound away from the victim's vehicle.  Approximately two minutes later, witness #1 stated he/she observed the victim come to witness #1's front door asking for help.  Officers recovered video surveillance from a camera at witness #1's residence.

18.  Officers encountered witness #2, who resided approximately 50 yards west of where the shooting occurred. Witness #2 told officers he/she was inside his/her residence when he/she heard a commotion.  Witness #2 went outside and saw two black male subjects, believed to be juveniles, running southbound on Cedar Dr. from W. Hill Dr.  He/she stated the

---

[2] The true identities of the witnesses referred to in this affidavit and the exact addresses where the shooting occurred are known to law enforcement.  However, to maintain the integrity of the investigation and to prevent witness/victim intimidation and to protect the privacy of the witnesses, I have not included full legal names or addresses in this affidavit.

trailing suspect was holding something while he was running. He/she then observed what he/she described as a brown four door Mercedes parked in front of his/her neighbor's residence, with an unidentified black male adult in the driver's seat.  He/she then watched as the two black male juveniles entered the Mercedes which immediately departed southbound on Cedar Dr.

19.  After speaking with witness #2, officers interviewed witness #3, who occupied the residence in front of which victim #2 saw the Mercedes parked.  Witness #3 did not observe anything outside his/her residence, but stated he/she had surveillance cameras which could be downloaded on a later date.  Officers arranged for the download of the video, which was later acquired from witness #3 for analysis by homicide detectives.

**C.   Review of Surveillance Video Acquired Initially From Witness #1**

20.  On August 13, 2021, I reviewed the surveillance video acquired from Det. Reyna which was previously retrieved from witness #1.  The surveillance video began at approximately 6:51 p.m. with the two suspects walking east on W. Hill Dr. and coming into the camera frame.  Both suspects appeared to be dressed in all black and continued walking as the victim's black BMW came into the frame from the right, traveling west on W. Hill Dr.  The victim pulled his vehicle to a stop as the two suspects stood near the passenger side of the vehicle, slightly obscured from the camera due to an overgrown tree.  The cropped screenshot below is included for reference, displaying the

victim's vehicle just a few yards shy of it's final stopping
point (suspects still approaching and obscured by tree).



21.  As the vehicle came to a stop, I heard a male voice
saying something to the effect of "What up?"  Over the next 70
seconds or so, I heard unintelligible male voices but no
distinct activity was seen on the video.  However, approximately
75 seconds after the suspects and victim initiated their
exchange, I heard the distinct sound of what I recognized to be
a single gunshot, ringing out on the recording.  I know from
experience investigating dozens of shootings as well as watching
and listening to hours of surveillance videos that it is not
unusual for surveillance video to only pickup one gunshot,
despite evidence confirming the presence of multiple discharged
rounds.  The presence of the gunshot was also evident by the
reactions of a witness who was visible on camera at the time of
the event.

22.  In the seconds after the gunshot rang out, I saw rapid
movement by the suspects visible through the leaves of the tree.
I then heard what sounded like a door being slammed, followed by
a male voice shouting what I interpreted to be, "Go," just as

the two suspects began sprinting away westbound towards Cedar Dr. and out of view of the camera.  Approximately five seconds after the suspects initiated their sprint from the victim's car, I heard the distinct sound of a metal object falling to the ground and spinning, followed again by seemingly distant male voices shouting two short phrases.

23.  Prior to reviewing the video, I spoke with Det. Reyna and other seasoned officers who commonly encounter suspects tossing firearms during encounters with SBPD officers in San Bernardino.  Det. Reyna and others who observed the video were highly confident in their belief that the sound was a pistol falling to the ground, a conclusion I agree with based on my own training and experience.

24.  Finally, minutes after the shooting, the victim walked to a neighboring residence seeking help.  I could clearly see the victim walking from his vehicle toward the residence.  The victim, holding his neck with his left hand, had bright red blood streaming down the front and left-hand side of his white shirt.  A second, separate wound appeared in the form of a bright red spot near the rear part of the victim's right shoulder.  On video, I could hear the victim attempting to speak, but the victim's words appeared unintelligible, likely due to the gunshot wound in his neck.  Prior to the video cutting off, the victim walked back into the street near his vehicle, unsuccessfully attempting to seek aide from a passing vehicle.  The victim then walked towards the location where

officers found him.  I included a screenshot from the
surveillance video depicting the victim's gunshot wounds.



25.  I then moved on to a review of the surveillance video
gathered from witness #3, also provided to me by Det. Reyna.  I
noticed the surveillance video, which recorded an area northeast
from Cedar Dr. towards W. Hill Dr., did not pick up the
suspects' approach to the victim's vehicle.  However, the video
did capture the suspects as they ran along the north curb line
of W. Hill Dr., turning south, and crossing the street.  The
video clearly showed the suspects sprinting south of the eastern
portion of Cedar Drive.  Although the exact times depicted on
both cameras did not match, a common occurrence when comparing
multiple surveillance systems, I am confident the suspect I saw
on witness #3's surveillance system are the same suspects from
the prior video, as the clothing and direction of travel
matched.

26.  As the suspects rounded the corner, I noticed the lead
suspect to be a black male, tall and appearing be of a heavier

build than the other suspect, wearing a black hooded sweatshirt, black sweatpants with white around the knees, and dark colored shoes.  The lead suspect looked back as the suspect to the rear appeared to reach down for something.  I saw the trailing suspect to be a shorter black male of average build, wearing a black hooded sweatshirt with white lettering or a white design on the front, sporting black pants and unknown-colored shoes.  I have included a screenshot from the surveillance video, taken just after the lead suspect looked back, which shows which shows both suspects dressed in black approaching the Mercedes:



27.  I continued my analysis of the video and watched as a gold Mercedes E Class sedan, with its driver's door window partially open, traveled north on Cedar Drive and came to a stop just one residence south of W. Hill Drive.  The lead suspect went immediately to the rear passenger door, opening and getting into the sedan.  The trailing suspect, visible carrying a black

tote bag strung over his left shoulder, went to the front passenger door.  A spilt second after the front passenger door closed, the Mercedes made an immediate turn to the west and into the closest available driveway.  I noticed the driver's side window rolled up as the vehicle was turning, obscuring the driver's appearance through dark tinting which covered the side and rear windows of the luxury sedan.

28.  As the driver pulled in to the driveway, the driver immediately put the vehicle into reverse, backing out quickly to the north, and then accelerating quickly to travel south down Cedar Drive, back tracking its prior route.

29.  I have included an area map generated via Google Earth which depicts the victim's vehicle in relation to where the suspects were picked up by the Mercedes.  The map also includes arrows depicting the Mercedes' route of travel.  The



map (seen below) shows the relatively close proximity of where
the shooting occurred and where the suspects were picked up.

**D.    Interview of Victim's Family & Cell Phone Analysis**

30.  Det. Reyna interviewed the family of the victim,
learning the victim operated a mobile marijuana dispensary
business.  Family members stated the victim had armed himself
with a firearm due to the inherent dangers of being involved in
that type of business.  Det. Reyna learned the victim had
acquired a 9mm Smith and Wesson pistol bearing serial number
NJT4801, purchased by that the victim's brother and then
provided to the victim for protection.

31.  Det. Reyna learned the victim utilized his phone and
Snapchat account to conduct his marijuana sales business.  Det.
Reyna identified the victim's Snapchat accounts as user IDs
Jumpman_ovoxo and Numba1hustlaaa, and learned the victim
utilized cell phone number 626-598-4058.

32.  Det. Reyna later analyzed the victim's cell phone,
being provided the passcode to the iPhone by the mother of the
victim's child.  Det. Reyna saw that just prior to the shooting,
which was reported at 6:54 p.m., the victim had messages sent at
6:45 p.m. and 6:49 p.m. reading "the school" and "yo" as well as
cancelled calls with a Snapchat account user utilizing user ID
Kdb_3x.  Det. Reyna believed the message reading "the school"
sent by the victim was in reference to Cajon High School,
located at 1200 W. Hill Drive.

E.    Identification of Suspect Mercedes

33.  On August 5, 2021, a previously interviewed witness
contacted SBPD and stated he/she had observed the suspect
Mercedes parked at a nearby apartment complex.  Det. Reyna met
with the witness who pointed out a gold Mercedes, which
displayed California License Plate 8VRW535 and was parked in the
driveway to the apartment complex located at 1064 W. 48th St. in
San Bernardino.  Det. Reyna noted the apartment complex was just
a block south of the scene of the shooting, less than half a
mile drive from the scene.

34.  Det. Reyna saw both vehicles were a match in make,
model, and color.  Det. Reyna then compared the specific
features of the suspect Mercedes in the surveillance video with
those seen on the vehicle parked at the apartment complex.  Det.
Reyna saw both vehicles had identical collision damage to the
right front bumper, as well as matching tinted windows, wheels,
and sunroofs.  Thus, Det. Reyna believed the vehicle parked at
the complex was in fact the suspect vehicle from the homicide.

35.  Members of the SBPD Special Investigations Unit
("SIU"), the team I am presently embedded with as part of my
assignment working out of the ATF San Bernardino Satellite
Office, conducted surveillance on the Mercedes and the apartment
complex.

36.  SIU officers observed the suspect Mercedes to be
parked closest to the front door for Apartment 2 at 1064 W. 48th
St., located on the lower level of the southwest corner of the
complex.  SIU officers observed two black male subjects, in

their late teens to early 20s, with physical characteristics which matched those provided by witnesses and seen on surveillance video which captured the shooting.  The two subjects entered and exited Apartment 2.

37.  While SIU officers conducted surveillance, SBPD criminal intelligence personnel conducted a workup of Apartment 2.  Det. Reyna learned the apartment was associated with Rontrell who obstructed a carjacking investigation that resulted in Rontrell's arrest on June 3, 2021.  Det. Reyna examined a booking photo taken at the time of Rontrell's arrest nearly two months earlier and noticed his physical appearance matched that of one of the two suspects running from the homicide victim's BMW.  SIU officers on surveillance reviewed Rontrell's booking photo and confirmed Rontrell was a subject they saw repeatedly entering and leaving Apartment 2.  I later examined the report associated with Rontrell's June 3, 2021, arrest and learned the following:

a.   On June 3, 2021, SBPD officers received reports of a carjacking in the city, with the suspect using a firearm to threaten the victim.  Officers quickly located the victim's vehicle and a high-speed pursuit ensued.  Officers pursued the driver who subsequently got out of the vehicle and fled on foot approximately halfway down 4th street south of W. Reservoir Dr. and W. 48th St. (approximately 200 yards northwest of Apartment 2).  Officers recognized the driver matched the description of the carjacking suspect and pursued the suspect during a short

foot pursuit, finally taking the suspect into custody in the
rear of 4200 N. Cedar Drive.

      b.   As the suspect was being escorted to the nearest
marked unit, three confrontational subjects started aggressively
moving towards the arresting officers.  The three subjects
started throwing up hand gestures the officers recognized to be
gang signs.  One of the three subjects yelled to the officers,
"On Crips, you're not taking my cousin!"  SBPD Officer A.
Estrella stepped in front of the three subjects to prevent them
from interfering with placing the carjacking suspect in the
marked unit.  The three suspects repeatedly refused to back up
or follow Officer Estrella's commands.  One of the three
suspects, later identified as Rontrell, pulled out a cell phone
and turned on its light, attempting to distract and blind
Officer Estrella, standing just three feet in front of him.
Officer Estrella noted at the time Rontrell had clenched fists
and was displaying what he believed based on training and
experience to be pre-assault indicators.  Rontrell continued to
shuffle around in a fighting stance while boasting he was a
grape street gang member, taunting the officers to fight.

      c.   While Rontrell was confronting Officer Estrella,
a second subject, later identified as D.J., turned to walk away
as if he was leaving the confrontation.  Suddenly, D.J. turned
around and quickly walked in Officer Estrella's direction,
bumping Officer Estrella with his left shoulder then placing his
cell phone in the officer's face.  Officer Estrella attempted to
keep moving as the third subject kept moving his hands to his

waistband.  The officers on scene suspected the three were notified by the carjacking suspect and were possibly trying to distract and delay officers from recovering evidence, including an outstanding firearm believed to have been tossed during the foot pursuit.  The three subjects continued to taunt the officers bragging that the officers wouldn't touch them due to their status as Crips gang members.

        d.   Officer Estrella attempted to detain D.J., with D.J. pulling away then tripping on his own feet and going to the ground.  After a short scuffle, D.J. was taken into custody. Approximately three minutes after D.J. was taken into custody, Rontrell again approached officers, claiming he was upset J D.J.had been detained.  SBPD Sgt. T. King instructed Rontrell to back away from the officers and Rontrell refused, waving around a purple dew rag and stating he was a grape street gang member while also yelling, "I'm not moving!"  Rontrell challenged Sgt. King and the other officers present to a fight, balling up his fists.  As Sgt. King and Officer Estrella approached Rontrell, who was standing in an intersection creating a traffic hazard, Rontrell yelled, "You better catch me," before sprinting northbound from the location.  After running 80 feet, Rontrell's shoe flew off, causing him to fall to the ground.  Rontrell was taken into custody.  Rontrell, D.J., and the third person who had confronted the officers who had taken the carjacking suspect into custody were cited for violation of California Penal Code 148(a)(1) willfully resist, delay, or obstruction of a peace officer.

38.  After reading the report documenting Rontrell and D.J. arrests for obstruction, I examined the criminal history of both Rontrell and D.J.  I was aware that at the time of the obstruction arrest, D.J. was still a juvenile, just 14 days shy of his 18th birthday.  However, I found it notable that in the preceding 15 months, D.J. was arrested once for burglary, and twice for robbery on two separate occasions.  Additionally, I saw that Rontrell had an arrest for battery.

**F.   Search Warrant Executed on Apartment 2 & the Suspect Mercedes**

39.  On August 10, 2021, Det. Reyna authored a state search warrant for both the gold Mercedes and 1064 W. 48th St. Apartment 2.  The search warrant for both the vehicle and the apartment was signed and issued by the Honorable Judge Libutti in the Superior Court of California, County of San Bernardino.

40.  On the morning of August 12, 2021, at approximately 9:30 a.m., SBPD officers executed the warrant.  Officers made announcements for occupants to exit the residence, but the occupants delayed approximately five minutes before complying with officers' demands.  Officers detained Martrell and Rontrell, along with two other adults and two juveniles.  Detectives assigned to the Homicide and Robbery Units then initiated their search.  The following is a summary of the items recovered during the search of the residence:

a.   In the living room, Det. D. Sims located an empty 9mm high-capacity magazine in the bottom drawer of the entertainment center.

   b.   In the northwest bedroom, Det. J. Alvarez located
a pistol case for Zigana PX-9 9mm pistol, with the box
displaying serial number 712135218775.  Inside the pistol case
was a box of DRZ 9mm ammunition, as well as miscellaneous gun
parts.  Det. Alvarez also located a 9mm/.40 caliber handgun
magazine loader on the closet shelf.  A black Mercedes key fob
was also found in the room on the TV stand, along with documents
with the name "Rontrell Shaw" on the floor near the closet.
Four black sweaters were located in the closet, as were two
pairs of black Jordan shoes.  Det. Alvarez saw a black and red
backpack which contained a brown wallet with a Nevada
Identification Card displaying the name "Rontrell Shaw."

   c.   In the northeast bedroom, Det. J. Joyce located a
black duffle bag concealed inside a black trash can near the
north wall of the bedroom.  Inside the duffle was a black and
tan, unserialized Glock-type P80 handgun equipped with a
tactical light.  The handgun, categorized as a privately made
firearm by ATF and more commonly referred to as a "ghost gun" in
the law enforcement community, was loaded with an inserted
magazine containing eight rounds of 9mm ammunition.

   41.  The 2004 gold Mercedes was towed to the SBPD station
for forensic processing and search by Det. Sims of the Homicide
Unit.  A DMV records check indicated the registered owner was
H.E. [3] or B.J. of Rosemead, California, with a release of
liability to a M.E. of Upland, California.  Det. Sims noticed

---

   [3] The subject's name is known to law enforcement but
abbreviated

the outside of the vehicle was in overall poor condition, with outside and inside of the vehicle exhibited moderate damage. After the vehicle was processed for forensic evidence, Det. Sims searched the passenger compartment. The following is a summary of the items identified during Det. Sims search:

a. In the driver's door pocket, two separate receipts for the Wing Stop located at 4244 University Prky in San Bernardino was found. The receipts were dated July 31, 2021 at 9:13 p.m. and 9:15 p.m. respectively, approximately two hours after the homicide. The Wing Stop was only 2.6 miles from the scene of the homicide. A third receipt was dated July 25, 2021, at 1:45 p.m. for the Stater Brother at Shandin Hills. The Stater Brothers Shandin Hills location is located at 977 Kendall Dr. in San Bernardino, .9 miles from the homicide location.

b. In the glove compartment, Det. Sims located a San Bernardino County Sheriff's Department booking record for Rontrell. The booking record was dated June 4, 2021, at 2:30 a.m. Two citations in Rontrell's name were also located, one dated June 3, 2021, and the other dated June 4, 2021. In the rear passenger seat, just inside the back window, Det. Sims located a black Vans sweatshirt.

42. Officers transported Martrell and Rontrell from their residence to the SBPD station for interview by Det. Reyna. Both subjects were placed in separate interview rooms and their handcuffs were removed.

### G. Martrell Admits to Knowing Third Suspect Brought a Gun Instead of Enough Money to Make a Purchase and Stated "Our Intention Was to Rob Him"

43.   Det. Reyna entered the interview room and greeted Martrell.  Det. Reyna learned Martrell resided at Apartment 2, mentioning it was his mother's residence and that he had been residing at the address since the beginning of 2020.  Det. Reyna told Martrell he would like to discuss the investigation which brought him to the search warrant earlier that morning as well as the recovery of the firearm at the residence.  Martrell agreed to speak with Det. Reyna and stated he was trying to get his life back together after being shot in the preceding year. Det. Reyna then advised Martrell of his *Miranda* rights and said, "Yes sir," when asked if he understood the rights that had been read to him.  Martrell then signed a waiver which covered the *Miranda* warning.  The following is a summary of the *Mirandized* interview which was audio and video recorded and provided to me by Det. Reyna:

    a.   When asked why he believed the police were at his residence, Martrell speculated it was possibly related to his cousin's arrest nearby earlier in June 2021, mentioning rough specifics of the event, including his brother Rontrell's arrest for obstruction.  Martrell stated he was not present at the incident but was trying out a new job in the high desert.  When asked by Det. Reyna if he was presently employed, Martrell stated he was not, acknowledging he could probably acquire a job at a fast-food restaurant but insisting he would not flip burgers, preferring to wait for something better.

b.    When asked about the gun which was recovered at the residence, Martrell stated he had seen no firearms present in the residence.  Referencing the firearm, Martrell stated, "My brother, I'm not saying he don't have a gun, but me personally do I have knowledge of him, no.  Never."  Martrell claimed he had never seen his brother with a firearm.  When asked if any other contraband would be located in the residence, Martrell speculated possibly a small quantity of marijuana, disclosing the adults in the residence, including he and his brother Rontrell, regularly smoked marijuana.  Martrell specifically stated they did not sell marijuana, saying he would rather sell boxes of candy than sell drugs.

c.    Martrell stated the gold Mercedes outside the residence belonged to Rontrell, mentioning he just got the vehicle.  Montrell mentioned his brother purchased the vehicle on Offer Up, speculating it was purchased on July 31 or August 1, 2021.  Referencing who drove the Mercedes, Montrell stated his brother Rontrell was the primary driver, but was hesitant to lock himself into saying no one else ever drove the vehicle.

d.    Det. Reyna asked Martrell what he remembered about July 31, 2021.  Martrell stated it was a cousin's 22nd birthday that day, adding he was in Las Vegas to celebrate his cousin's birthday.  Martrell stated the cousin moved to Las Vegas in 2018 and that he was close to the cousin due to the cousin's family struggles.

e.    When Det. Reyna cautioned Martrell that it was in his best interest to tell the truth, Martrell clarified that he

24

was in San Bernardino earlier on July 31, 2021, only going to
Las Vegas later that night.  Martrell stated he smoked so much
marijuana that he could not remember what time, but estimated
between 5:00p.m. and 7:00p.m., stating he traveled with five
people in the car, all being his cousin or his cousin's friends.
Martrell stated his brother Rontrell was not with him on the
trip, and that he returned from the trip the following
afternoon.

   f.   Det. Reyna encouraged Martrell to set the record
straight on what occurred earlier on July 31, 2021, telling
Martrell to tell him what happened.  Martrell stated he and his
brother, Rontrell, and a third person needed some marijuana.  He
stated, "Some dude had came through, whatever.  We met him at
the school.  We get there to get the weed, and ah.  Fuck.  I
don't want to say it.  Fuck.  I don't want to snitch or
nothing."  Martrell paused, placing his head against the wall in
the interview room.  Det. Reyna again reinforced his earlier
advice to Martrell, telling him to tell the truth and stating he
was aware Martrell was on scene.  Martrell acknowledged that he,
Rontrell, and the third robber did not have enough money to
purchase the marijuana that they had ordered by saying the
following:

   i.   "Yeah I was there, but I ain't gonna lie to
you, I did participate in it."  Martrell continued, "we probably
got like $30 on all of us.  He's telling him to bring a pound
worth of weed through.  $1300, or some shit like that.  Telling
him he got the money for that, or whatever.  You know, me just

wanting to smoke, I'm going along with it, fuck it.  We got to
go right there and we about to get the weed."

       g.  After acknowledging that he knew the robbers did
not have the money to buy the marijuana they had ordered,
Martrell went on to acknowledge he knew that one of robbers was
armed with a firearm by saying the following:

         i.  ". . . . I knew, I ain't gonna lie to you
and say I didn't know he [referring to one of the other robbers]
had a gun like, you know, I didn't know he had a gun.  I knew he
had a gun like, but I didn't think he was gonna like shoot him
or nothing like."

       h.  Det. Reyna asked which school the two met the
victim at, with Martrell responding, "Cajon High School."  Det.
Reyna asked what kind of car the victim was driving and where
was the victim seated.  Martrell responded, "Small black car, I
not sure what kind though," and "In the driver's seat."
Martrell stated that the robber who shot the victim was
pretending to reach for his phone, but he was "also reaching for
the gun at the same time."

       i.  Det. Reyna asked what the victim did when the gun
was pointed at him.  Martrell stated the victim was reluctant to
comply, adding, "I guess the guy already had a gun."  Det Reyna
stated, did you see the guy with a gun?"  Martrell responded,
"Yeah" and explained when the third suspect came back, he had a
second gun.  Det. Reyna asked where the victim stored his
firearm.  Martrell stated, "It was in his door."

j.   Det. Reyna asked what the victim did with the gun.  Martrell said, as the victim was grabbing his own gun, but "It was too late" for him.  Martrell estimated the third suspect shot the victim once or twice, adding he did not know where the victim was hit.  Martrell stated that the third suspect brought the marijuana back to the car and it was in a black bag.

k.   Martrell also stated that he kept some of the stolen marijuana after the robbery.  Martrell described both the gun the third suspect used to shoot the victim as well as the victim's gun as non-descript black handguns.

l.   Martrell said the two ran and fled the scene in his brother's car.  Det. Reyna asked, "Rontrell's car?" Martrell responded, "Yeah," then interrupting Det. Reyna's follow up, Martrell continued stating, "Our intention was to rob him."  Martrell stated his brother Rontrell was driving and that he, his brother, and the third suspect were the only ones in the vehicle when fleeing the scene.

m.   Det. Reyna asked how Rontrell knew to pick up Montrell and the third suspect.  Martrell stated, "He wasn't really picking us up.  He was already there."  Rontrell then drove to a Circle K near Date St. and Del Rosa to drop off the third suspect.  Martrell stated he estimated the third suspect gave him three grams of marijuana, with the third suspect taking the rest of the marijuana and the two guns.  When Martrell stated Rontrell insisted on getting the suspect out of the car because he just shot someone, Det. Reyna questioned how Rontrell had knowledge of the shooting.  Martrell stated he had told

Rontrell about what happened.  Martrell stated after he and Rontrell dropped off the third suspect, the two went back to Apartment 2.

n.   Det. Reyna told Martrell he needed more info to find the third suspect.  Martrell stated he didn't know the third suspect's full name and said he had poor memory from frequent use of marijuana.

o.   Det Reyna asked for the time of the event and Martrell opened up, providing a narration of the events. Martrell stated he and his brother were at home playing a game when Rontrell got a call from the third suspect who invited Rontrell to get together to smoke marijuana.  The third suspect stated he did not have any marijuana, but had approximately $30, Martrell had approximately $20 of his own, and Rontrell had $15. Martrell stated he believed the third suspect was texting his dealer on Snapchat and ordering a pound of marijuana.  Det. Reyna asked how much the dealer (the victim) offered to sell the pound for and Martrell stated he believed it was going to cost $1,300, despite only having an estimated $60 collectively between the three.

p.   Sensing Martrell was holding out on details as Martrell stated he never viewed the Snapchat correspondence, Det. Reyna asked Martrell how he knew the ordered amount and quoted price.  Martrell responded that the third suspect went to Apartment 2 with him and his brother before the shooting, and that the victim was bragging about all the marijuana the victim had for sale, showing videos of pounds of marijuana.  Martrell

28

stated, "This is how I found out that we, he was going to rob him. We ah. Actually, we was gonna finna walk to meet him." Martrell said the victim took forever, so when the victim stated he was at the location, Martrell stated, "So my brother park, we get out and walked up. As we walked up." Det Reyna interrupted and asked where Rontrell dropped the two off. Martrell responded, "He dropped us off right in front of the school. He wasn't trying to hide or nothing like that."

q.   Carrying on with the story as both he and the third suspect were out of Rontrell's Mercedes, Martrell stated, "As we walked up. Ah. He whispered to me. I'm gonna get him. I'm gonna get him." Det Reyna asked, "What did that mean to you?" Martrell stated, "I kind already knew this dude trying to do something, but then once he showed me the gun, I already knew what time it was," telling Det. Reyna that the third suspect had the gun inside his front waistband, sliding it to his right side as he sat down. Det Reyna asked Martrell if the third suspect said anything else walking up to the car and Martrell stated, "He told me really to just watch out for him." Martrell stated the third suspect kept saying "I'm gonna get him." Det. Reyna questioned whether Martrell interpreted that as meaning the third suspect was going rob the victim and Martrell responded, "I knew he was. I didn't think he was going to shoot him, dude bro, to tell you the truth. Did he die?" Det. Reyna nodded up and down.

r.   Det. Reyna asked where Martrell was standing when the third suspect was in the car. Martrell stated he was

leaning on the vehicle standing over the open door with the third suspect seated in the victim's vehicle during the exchange.  Going over the details a second time, Martrell stated as the victim looked down at his phone to get the info for his own cash app, the third suspect pulled out the firearm.  The third suspect did not ask the victim for any money, just telling the victim that he was taking the victim's marijuana.  Martrell said by that time, the victim attempted to think fast and pulled his own firearm, but before the victim could raise his own firearm completely out of the driver's side door panel, he watched as the first shot went off.  Martrell said at that time he started running, clarifying that the victim did not have time to fire off any rounds, and believing the third suspect shot twice.

s.   Det. Reyna asked where the third suspect pointed the weapon and Martrell stated the weapon was pointed up on the victim, not quite at the victim's head but on the victim's upper body.  Martrell stated he got picked up by Rontrell who was already in the area, stating he got into the front seat of the Mercedes and the third suspect, holding the marijuana and the victim's gun, got into the back seat.

**H.   Rontrell Reports Telling Martrell and the Third Suspect Not to Rob The Victim, Says "I Helped Them," and Kept a Share of the Robbery Proceeds**

44.   Det. Reyna entered the interview room and greeted Rontrell, asking him if he needed a water or anything to drink. Det. Reyna asked Rontrell if he was ready to talk and Rontrell acknowledged Det. Reyna, who then apologized for the delay in

the interview.  Det. Reyna told Rontrell he had just finished the interview with Martrell and said that Martrell had come clean.  Det. Reyna encouraged Rontrell to tell the truth, stating that he was aware he had misdemeanor warrants and that he would be booked on the warrants and possibly bail out over the weekend.  Det. Reyna confirmed Rontrell's identity and Rontrell disclosed he lived at Apartment 2 just like his brother.

45.  Det. Reyna advised Rontrell of his *Miranda* rights and Rontrell said "Yeah," when asked if he understood the rights read to him, and "Yeah, I'll talk about it," when asked if he wanted to discuss the investigation.  Rontrell then signed a waiver which covered the Miranda warning which Det. Reyna had just provided orally .  The following is a summary of the *Mirandized* interview which was audio and video recorded and provided to me by Det. Reyna:

a.  Rontrell stated he was not aware what investigation Det. Reyna was referring to.  Det. Reyna then disclosed the investigation was related to the July 31, 2021, encounter where he and his brother were trying to purchase marijuana.  Rontrell initially stated he dropped "them off" and 30-40 minutes later picked "them" up.  Rontrell stated when he went back to pick them up, he saw them running and drove the two (thus far unidentified in the interview) back to his house, seeing a police response immediately after.

b.  Rontrell stated after he picked up Martrell and the third suspect and brought them back to his apartment, he saw

the police response and asked his brother what was going on. Rontrell stated his brother told him, "We did a lick." Rontrell stated Martrell and the third suspect split up the marijuana and then the third suspect left his apartment.

  c. Det. Reyna asked what time the third suspect arrived at Apartment 2 on July 31, 2021. Rontrell stated the third suspect took a bus and arrived at Apartment 2 about 10:00 a.m. Rontrell stated the third suspect and his brother began smoking marijuana and he later left the apartment to get food with his girlfriend. Rontrell stated upon his return around 4:00 p.m., he went and picked up the two when they were running down the street.

  d. Rontrell later clarified stating around 3:45 p.m. or 4:00 p.m., he dropped off his brother and the third suspect near Cajon St., seeing the third suspect talking on the phone and telling someone on the other line to bring the marijuana to Cajon (High School). Describing what followed after he dropped the two off, Rontrell stated, "I guess he pulled up, they chop it up, all I hear is pop, pop." Det. Reyna told Rontrell not to guess, but to tell him the truth.

  e. Rontrell stated he dropped his brother and the third suspect off in front of Cajon High School and no one was there. Rontrell stated he drove back to the house. Rontrell stated, "he called the dude and was like, bring the weed up here." Det. Reyna asked Rontrell how he knew the third suspect called the victim and Rontrell said the third suspect had done so as he was dropping them off. Rontrell stated he then went

home and heard two shots.  Det. Reyna questioned how it was possible Rontrell heard the two shots all the way at his apartment.  Rontrell stated he was outside getting back in his car, adding he had a bad feeling his brother and the third suspect were going to do something stupid.  He stated he warned the two prior to getting out of the car to not rob the victim, stating it was not worth ruining their lives for a pound of weed.

   f. Suspecting Rontrell was holding back information, Det. Reyna asked Rontrell how he knew the two were going to buy a pound.  Rontrell said, "They told me they was picking up two ounces."  When the two returned to his car, Rontrell said he saw the bag with a "big ass bag of weed," stating he had sold marijuana before and had experience judging prices and quantities.  Rontrell said when he heard the gunshots coming from the area of Cajon, he "hit the block" and drove north on Cedar Ave., seeing his brother and the third suspect running towards him.  Rontrell stated he observed both Montrell and the third suspect sweating, then drove the two home to Apartment 2.  Rontrell said it was then that he heard the police and asked the two what had happened.

   g. Rontrell stated when his brother and the third suspect entered his house as police cars responded to the scene, he began cussing the two out.  Rontrell stated the two showed him the bag of marijuana which was taken from the victim.  Rontrell stated about two hours later after the police presence had died down, the third suspect "took his half" and left.

h.   Det. Reyna asked for details about the two running back to Rontrell's Mercedes. Rontrell stated the two ran back with a "big ass black bag," first saying the third suspect was carrying it, but then correcting and stating Martrell was holding the bag, described as a black bag containing an entire pound of marijuana. Rontrell stated the two were holding their pockets but did not see any firearms. Rontrell added that when he dropped the two off, he also did not see any firearms, mentioning again he believed the two were going to buy two ounces, one for the third suspect and one to be split between he and his brother. Rontrell stated he provided $50 to the two before they got out of the car.

i.   Rontrell stated when they got back to the apartment, the third suspect exited the back seat and went up to the front passenger seat where his brother was seated. Rontrell stated the third suspect then grabbed the bag of marijuana, packaged in a large black Ziploc bag, taking it inside and later showing Rontrell. Without being prompted, Rontrell stated, "He gave me mine, he gave me about 56 grams and he got on. My brother split the rest and they got on. I wasn't part of it."

j.   Rontrell stated the victim was a large seller within the Inland Empire area. Referring to the cities served by the victim, Rontrell stated, "Sometimes he went to Vegas, for sure, cause that's where he came from that day, he told." When Det. Reyna asked how Rontrell knew the victim had traveled in from Las Vegas, Rontrell stated the third suspect and Martrell had been talking about it in his presence all morning.

34

Referring to the third suspect's statement prior to the shooting
and after, Rontrell stated, "They had been telling me, it was
going to be this much of weed, but he got a lot more than what
he told me.  You feel me?  When they bring it back, that's when
they split it down the middle.  He gave me more than what he
told me he was going to give me.  He was only going to give me
14 grams.  He gave me 56 and left."  When asked how much the
third suspect gave to Martrell, Rontrell responded, "They split
the rest down the middle."

     k.  Det. Reyna asked how Rontrell knew so much about
the victim and he stated both the third suspect and Martrell had
showed him pictures from social media, adding they were
communicating with the victim via Snapchat.

     l.  Rontrell stated the two did not talk anything
about the robbery when they were in the car, but once the two
were inside Apartment 2, they told him they had robbed the
victim and took the marijuana.  Rontrell said he did not believe
Martrell shot the victim, because Martrell had been shot in the
leg by members of the California Gardens Gang just six months
prior.

     m.  Rontrell stated when he dropped off Montrell and
the third suspect, he saw the victim's black BMW near Cedar Ave.
and Little Mountain.  Later, after the third suspect left his
apartment, he drove back up to the area and saw the police near
the same BMW.  Without being prompted by Det. Reyna, Rontrell
stated, "But I did, I'm gonna say if I did, I did have accessory

to robbery.  Because I helped them.  I helped them get there.
But the whole mission was not supposed to be like that."

46.  A short time later, Det. Reyna brought Rontrell's
phone into the interview room.  Rontrell provided consent to
search the phone, providing his passcode as "656565."

47.  Det. Reyna asked about the pistol found at Rontrell's
house.  Rontrell stated, "If there is any gun found at my house,
it's mine."  Rontrell stated he had a 9mm Glock 19, mentioning
it said P80 on the bottom with a green bottom and a black top.
Det. Reyna asked about the Zigana 9mm and Rontrell stated he had
already sold the firearm.  Seeing multiple photos of firearms on
Rontrell's phone, Det. Reyna asked Rontrell about the photos.
Rontrell stated his cousins would send him photos of firearms
and Rontrell would arrange for purchasers of the firearms.  Det.
Reyna then stepped out of the interview room.

**I.    Interstate Commerce**

48.  Based on training and experience, including the
collective knowledge of other law enforcement officers which has
been shared with me, I have learned controlled substances, such
as marijuana, travel in and have an effect on interstate and
foreign commerce.  Also, after consulting with the Assistant
United States Attorney assigned to this investigation, I
understand that the Supreme Court has stated that "if the
Government proves beyond a reasonable doubt that a robber
targeted a marijuana dealer's drugs or illegal proceeds, the
Government has proved beyond a reasonable doubt that commerce
over which the United States has jurisdiction was affected."

*Taylor v. United States*, 136 S. Ct. 2074, 2080-81 (2016).  In this case, because the robbers targeted a federally controlled substance, the interstate commerce element for a Hobbs Act Robbery is satisfied.

<u>**CONCLUSION**</u>

49.  For all of the reasons described above, there is probable cause to believe that on July 31, 2021, Martrell SHAW committed violations of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery); 924(c)(1)(A)(iii), (j)(1) (Use, Carry, Brandish, and Discharge a Firearm in Furtherance of a Crime of Violence Causing Death); and 2(a) (Aiding and Abetting) and Rontrell SHAW committed violations of 18 U.S.C. §§ 1951(a) (Interference with Commerce by Robbery) and 3 (Accessory After the Fact).

Attested to by the applicant, <u>ATF SA Jarrett Keegan</u>, in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>16th</u> day of <u>August    </u>, 2021.

UNITED STATES MAGISTRATE JUDGE